**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **SYLVIA MORRIS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-09-CV-242-KC** |
| | § | |
| **ADC TELECOMMUNICATIONS,** | § | |
| **INC.,** | § | |
| | § | |
| **Defendant**. | § | |

**ORDER**

On this day, the Court considered Defendant's "Motion for Summary Judgment"

("Motion") (Doc. No. 18).  For the reasons set forth below, the Motion is **GRANTED**.

**I.      BACKGROUND**

Defendant ADC Telecommunications, Inc. ("ADC"), a provider of communication

infrastructure products and services, is a business organization headquartered in Minnesota.

Def.'s Proposed Undisputed Facts ¶ 1 ("Def.'s Facts") (Doc. No. 18-1).  It has a sales and support

office, and a warehouse, located in Santa Teresa, New Mexico.  *Id.*  Plaintiff Sylvia Morris

("Morris") began work in that office as a "knowledge base assistant" in April 2007.  *Id.* ¶ 2.

Morris was laid off in November 2008.  *Id.* ¶ 6.  At the time, ADC cited uncertain economic

conditions as the reason for Morris's layoff, and now notes that it laid off a total of over 250 U.S.

based employees during the fall of 2008.  *Id.* ¶¶ 4-5.  Immediately after her layoff, some of

Morris's job functions were distributed among a number of ADC employees in other locations,

but her main functions concerning the maintenance of the knowledge base were re-activated or

re-consolidated after six or nine months and given to Suneetha Vangireddy ("Vangireddy"), who worked in Bangalore, India. *Id.* ¶ 7; *see also* Pl.'s Factual App. ("Pl.'s Facts") ¶ 7 (Doc. No. 19-1). Vangireddy earns a salary of approximately $12,000 per year, while Morris was paid approximately $36,000 per year while working for ADC. Def.'s Facts ¶ 7.

Believing that her layoff was motivated by unlawful discrimination, Morris filed an administrative charge of discrimination with the relevant agencies. *Id.* ¶ 8. Morris alleges that ADC was motivated by national origin discrimination, retaliation, and her association with another employee who complained of sexual harassment. *Id.* Morris states that her supervisor, Kate Kittiko ("Kittiko"), made a demeaning facial expression upon meeting Morris and ascertaining that Morris was of Mexican heritage. *Id.* ¶ 9. Morris also states that she complained to Kelly Ruff ("Ruff"), a human resources director, about the racism she perceived on Kittiko's part. Pl.'s Facts ¶ 10. Morris also complained to Ruff about other related matters, including the allegedly uncouth and/or racist behavior of an ADC supervisor named Denise Anderson. Def.'s Facts ¶ 13.

Morris filed the instant suit in Texas state court on March 30, 2009, seeking recovery under New Mexico employment discrimination law. Notice of Removal ¶ 1 (Doc. No. 1). ADC removed the case to this Court on June 29, 2009, citing diversity jurisdiction. *Id.* ¶¶ 1-5. ADC filed the instant Motion seeking summary judgment on June 3, 2010. Morris filed Plaintiff's Response to Defendant's Motion for Summary Judgment ("Response") (Doc. No. 19) on June 17, 2010. ADC filed its Reply on July 1, 2010 (Doc. No. 22), along with its Defendant's Objection to Plaintiff's Summary Judgment Evidence ("Defendant's Evidence Objections") (Doc. No 21).

## II.  DISCUSSION

### A.  Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).  The substantive law identifies which facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)).  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence

of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Inferences drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing" summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (ellipses in original). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### B.    Analysis

Morris sets forth claims for both national origin discrimination as well as retaliation under New Mexico employment law. This Order addresses each claim in turn.

### 1.    Morris claims national origin discrimination

Morris claims that her 2008 layoff was motived by national origin discrimination. *See* Resp. 1. ADC responds that her layoff was part of a larger cost-cutting program motivated by poor economic conditions and argues that her inclusion in this program was not motivated by unlawful discriminatory animus. *See* Mot. 4-8.

The New Mexico Human Rights Act ("NMHRA") prohibits employment discrimination on the basis of, inter alia, national origin. N.M. STAT. § 28-1-7(A). Employees complaining of employment discrimination may sue their employers, and, when analyzing cases brought under the NMHRA, New Mexico law has adopted the federal evidentiary framework promulgated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973); *see also Smith v. FDC Corp.*, 787 P.2d 433, 436 (N.M. 1990) ("The evidentiary methodology

-4-

adopted [in *McDonnell Douglas*] provides guidance for proving a violation of the New Mexico Human Rights Act.").  At the same time, New Mexico courts have been keen to stress that, while federal precedent may be used to shed light on NMHRA, the state "has not adopted federal law as [its] own."  *Id.*

The *McDonnell Douglas* framework is used to analyze a case of alleged discrimination where indirect evidence might support a finding of prohibited discrimination, even if no "direct proof" is available.  *Id.* at 436 n.1.  Accordingly, this framework may be bypassed in cases where direct evidence of discrimination is at issue.  *See Martinez v. Yellow Freight Sys.*, 113 N.M. 366, 369 (1992).  Under the *McDonnell Douglas* three-step framework, the complaining employee must first establish a prima facie case of employment discrimination.  411 U.S. at 802.  If a plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *Id.* Finally, assuming that the employer manages to make this articulation, the employee then has the "opportunity show that the [employer's] stated reason for [the adverse action] was in fact pretext."  *Id.* at 804.

A prima facie case of employment discrimination requires the plaintiff to prove four elements:  (1) that he or she belongs to a protected group; (2) that he or she was qualified for the job at issue; (3) that her or she suffered an adverse employment action; and (4) that he or she was replaced by someone outside the protected group or otherwise subject to a double standard or discriminatory adverse treatment.  *Id.* at 802; *see also Smith*, 787 P.2d at 437.  An adequate prima facie case places a burden of production on the defendant to articulate a "legitimate,

nondiscriminatory reason" for the adverse action.  *Martinez*, 113 N.M. at 368.  This requires the introduction of admissible evidence to support that reason.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

If the employer meets this burden, the plaintiff can challenge the veracity and adequacy of the employer's proffered nondiscriminatory reason in order to demonstrate that it is a mere pretext for unlawful discrimination.  *See McDonnell Douglas*, 411 U.S. at 802.  The plaintiff can attack the employer's reason by showing either:  (1) that the reason, and the purported facts underlying it, are simply not true; or, (2) that even though the reason and the facts behind it are true, the stated reason "is not the only reason" for the adverse employment action and that a "motivating factor" was the plaintiff's "protected characteristic."  *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *see also Cates v. Regents of N.M. Inst. of Mining & Tech.*, 124 N.M. 633, 638 (1998).  Though the first method of demonstrating pretext does not directly prove that discrimination was the reason behind the adverse action, demonstrating that the employer's explanation is false or unworthy of credence, when taken together with the plaintiff's prima facie case, may support a finding of discrimination even without further evidence of defendant's true motive.  *See Garcia-Montoya v. State Treasurer's Office*, 130 N.M. 25, 42 (2001).  As to the second method of showing pretext, *McDonnell Douglas* itself supports it, as there it was undisputed that the plaintiff had committed the bad acts cited by the employer as its reason for not rehiring him, and the only question was whether an additional discriminatory motive was involved.  411 U.S. at 795-96, 803.

        **a.**       **Morris sets forth a prima facie case of national origin discrimination**

Both ADC and Morris agree that Morris has set forth a prima facie case of employment discrimination, though ADC takes pains to argue that it is "weak." Mot. 5. It is undisputed that Morris is a member of a protected group, as she is of Mexican national origin, that she was qualified for her job, that she lost her job, and that her duties were ultimately assumed by an employee of a different national origin; namely, by Vangireddy, who is Indian.[1]

> **b.     ADC articulates a legitimate, nondiscriminatory reason for Morris's layoff**

To rebut the prima facie case of discrimination, ADC offers a legitimate, nondiscriminatory reason for Morris's layoff; namely, that hard economic times prompted a significant round of layoffs across the whole company. *See* Mot. 5, 12; *see also Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (recognizing a "reduction in force" as a legitimate, nondiscriminatory reason). ADC offers several pieces of evidence to support this reason. First, ADC has filed a copy of an email message dated October 22, 2008, entitled "Announce: A message from Bob Switz, Chairman, President and CEO" ("CEO Announcement") Mot. Ex. 7 (Doc. No. 18-2). In this message, Bob Switz comments on the "uncertain macroeconomic environment," states that there will be a corporate restructuring, and writes that these "restructuring efforts include reductions in the company's worldwide workforce." CEO Announcement 1. He also acknowledges that ADC will continue to "provide limited salary

---

[1]     Though there is some uncertainty over whether to regard Vangireddy as a direct replacement of Morris, see subsection (3) below, the Court here resolves this doubt in favor of the non-moving party and find that Morris has satisfied this element of the prima facie case.

adjustments where warranted based on individual levels of contribution and performance,"

though the budget for salary increases was reduced.  *Id.* 1-2.

Additionally, ADC has filed the Declaration of Shannon Gronemeyer, *see* Mot. Ex. C

("Gronemeyer Decl.") (Doc. No. 18-4), which discusses Morris's situation specifically.  In it,

Gronemeyer, an ADC executive, notes that ADC laid off approximately 250 U.S. employees

during the fall of 2008, that he specifically informed Kittiko that her department would be forced

to cut jobs as part of the restructuring, and that he and Kittiko chose two knowledge base

positions for termination because the knowledge base, while helpful, could be left unattended for

some time without serious detriment to the company.  *See* Gronemeyer Decl. ¶¶ 7-8.[2]

Gronemeyer also states that, after about half a year of neglect and an upsurge of interest, it

became clear that the knowledge base would require renewed maintenance, so he eventually

authorized the hiring of Vangireddy.  *Id.* ¶ 9.  Gronemeyer notes that Vangireddy earns about

$12,000 per year, while Morris was paid about $36,000 per year.  Def.'s Facts ¶ 7.  ADC has also

filed the Declaration of Kate Kittiko, Mot. Ex. D ("Kittiko Decl.") (Doc. 18-5), which relates

substantially the same information, but states that the actual hiring of Vangireddy took place

about nine months after Morris was laid off.  *See* Kittiko Decl. ¶ 5.

---

[2]       Morris also recounts an occasion where Gronemeyer announced that he did not expect "any kind of disruption" to the Santa Teresa workforce because it was a "low-cost center." Dep. of Sylvia Morris ("Morris Dep.") 136:4-137:24 (Doc. No. 19-2 Ex. A).  The Court regards this as an admission by a party opponent and thus not excluded by the hearsay rule.  *See* FED. R. EVID. 801(d)(2).  However, these remarks were apparently made in July 2008, several months before the CEO announced his restructuring program.  Morris Dep. 137:7-9.  Thus, they do not seriously call into question Gronemeyer's later testimony.

Thus, through the use of admissible evidence filed before the Court, ADC has articulated a legitimate, nondiscriminatory reason for Morris's layoff.  Accordingly, the burden shifts back to Morris to rebut this reason in order for her claim to survive.

### c.    Morris fails to rebut ADC's reason

Morris may rebut ADC's proffered reason in one of two ways.  She may show that it is untrue or unworthy of credence, which would allow a fact-finder to infer that discrimination or retaliation was the true motive, or she may show that, while the proffered reason is true, an additional impermissible motive was also behind the adverse employment action.  *See Cates*, 124 N.M. at 638.  An employee may concede the business necessity of a large-scale layoff while maintaining a claim that the decision to include her, in particular, in the laid-off group was premised on unlawful grounds.  *See Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1106 (10th Cir. 2008).  In such circumstances, courts look to inconsistencies and irregularities in the framing of the employer's reason behind the layoff, and how the layoff criteria were applied to the complaining employee, in order to ascertain whether the layoff served as a pretext for the commission of wrongful employment practices.  *Id.* at 1106-07; *see also* Resp. 7.  If a new employee is quickly hired to replace the laid off employee, legitimate doubts may be raised as to the assertion that the company eliminated the laid-off worker's position as part of a restructuring.  *Pilcher v. Cont'l Elecs. Corp.*, 121 F.3d 703, 1997 WL 450078, at *3 (5th Cir. 1997) (unpublished opinion).  Redistributing the laid-off worker's duties among several remaining employees, however, does not give rise to the same inference.  *Id.* at *4.

Morris argues that ADC's claim that she was laid off for economic reasons is undercut by

the fact that ADC gave raises, at the time, to certain other employees.  *See* Resp. 7.  This fact, however, does not point out an inconsistency in ADC's plans.  ADC executives have explained, after the fact, that giving out raises to remaining employees – who took over extra tasks from laid off employees – is not inconsistent with overall cost-cutting if the cost of the raises is outweighed by the savings brought about by the job cuts.  *See* Reply 4; Gronermeyer Decl. ¶ 7 n.1.  More tellingly, ADC's CEO announced, before the layoffs were even implemented, that some number of salary increases would be made even in the face of these budget cuts and layoffs.  *See* CEO Announcement 1-2.  Moreover, courts have recognized that salary increases for remaining employees can be made in the face of layoffs without automatically invalidating a company's cost-saving rationale.  *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 657 (5th Cir. 1996).  Beyond pointing to these raises generally, Morris has submitted no evidence which rebuts ADC's own explanations and evidence concerning the details of their restructuring program.  Thus, Morris has furnished the Court no reason to doubt that ADC's actions failed to conform with its plans, or that ADC's widely announced plans were logically inconsistent with its cost-cutting goals.

Morris goes on to argue that the evidence shows that ADC did not actually eliminate her job position during the layoff, which casts doubt on their restructuring rationale.  *See* Resp. 7-8.  However, Morris herself admits that no replacement was immediately hired and that her job duties were distributed among existing employees for at least a six month period.[3]  Resp. 8.  This

---

[3]         Morris and ADC also spar over whether the employees to whom her duties were redistributed were of Mexican national origin or not.  Resp. 8; Reply 5 n.3.  This issue is not important in the present context, however.  Replacement by a worker outside the class of the laid off worker is an element of a prima facie case of discrimination under the *McDonnell*

redistribution of duties does not suggest that the supposed job-elimination was illusory, as the immediate hiring of a replacement might.  *See Pilcher*, 121 F.3d 703, 1997 WL 450078, at *4.

The eventual re-consolidation of Morris's duties, and the hiring of Vangireddy to assume them, similarly fails to undercut ADC's position.  First, the period of six to nine months when the position did not exist, combined with ADC's explanation of a late upsurge in interest in the knowledge base tool, plausibly accounts for the elimination of the knowledge base maintenance position followed by its good faith reestablishment.[4]  *See* Reply 5; Gronemeyer Decl. ¶ 9.  Second, even if the Court concludes that ADC never truly eliminated Morris' position, a direct replacement of Morris by Vangireddy still does not undercut ADC's cost-savings rationale.  It is

---

*Douglas* test.  *See* 411 U.S. at 802.  Because the Court has resolved this uncertainty in favor of finding that Morris has set forth a prima facie case of discrimination, there is no need to consider that issue at this stage of the analysis.  The relevant question at this stage is whether a direct replacement was hired or whether Morris's duties were distributed among existing employees – not the national origin of any such employees.

[4]     Morris argues that there is some evidence showing that ADC sought to replace her about one month after her layoff.  *See* Resp. 7.  Specifically, Morris refers to her deposition testimony where she recounts a conversation with a technology consultant named Teddy Wu, who stated that he had discussed with an ADC manager the possibility of training a replacement for Morris.  *See* Morris Dep. 110:1-111:18.  This conversation was said to have taken place about a month after Morris was laid off.  *Id.*  ADC objects to this evidence on the grounds that it is hearsay.  *See generally* Def.'s Evid. Obj.  The Court finds that Morrs's recollections of Wu's out-of-court statements are inadmissible hearsay and will not consider this evidence on summary judgment.  *See* FED. R. EVID. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *see also* see also *Thomas v. Atmos Energy Corp.*, 223 F. App'x 369, 373 (5th Cir. 2007) (holding that the rule against hearsay applies at the summary judgment stage).

undisputed that ADC pays Vangireddy two thirds less than it paid Morris – a savings of about $24,000 per year in wages.  *See* Def.'s Facts ¶ 7.  Without such cost savings, a decision to fire an employee and immediately hire a replacement would not be sensible under a restructuring theory, and would cast doubt on such a proffered reason.  But, as implemented, the offshoring of Morris's job is consistent with ADC's legitimate, nondiscriminatory cost-saving reason for her layoff because it saved ADC a significant sum of money.

The Court thus finds that ADC came forward with a legitimate, nondiscriminatory reason for Morris's layoff and offered substantial evidence to support and explain this reason.  Morris has failed to show either that ADC's proffered reason was false, that the layoff plan was implemented inconsistently or illogically, or that she was included in a valid layoff for ulterior reasons.  ADC's legitimate, nondiscriminatory reason defeats Morris's prima facie case of discrimination; Morris, in turn, has failed to undermine ADC's reason.  Accordingly, summary judgment should be granted in ADC's favor.

### d.    No direct evidence case of discrimination

The *McDonnell Douglas* framework is not the exclusive means for proving a case of employment discrimination.  Where direct evidence exists of such wrongs, the burden-shifting test may be bypassed in favor of an unfiltered evaluation of the direct evidence.  *See Martinez*, 113 N.M. at 369.  ADC argues that Morris's claim cannot survive summary judgment when her evidence is evaluated in this manner.  *See* Mot. 9.  Morris's evidence that Kittiko looked at her in a demeaning fashion, and that Denise Anderson made allegedly racist comments at the ADC workplace, are insufficient to create an issue of fact to be decided by the jury.

Occasional instances of animus may give rise to the inference that an adverse employment action was motivated by discrimination only when such incidents pass the "stray remarks" test. *See Asbury v. Geren*, 582 F. Supp. 2d 1323, 1337-38 (D.N.M. 2008) (applying a "stray remarks" test); *see also Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 404 n.7 (5th Cir. 2001) (holding that it can be "appropriate to analyze such comments as direct evidence of discrimination, apart from the *McDonnell Douglas* framework").  In *Brown v. CSC Logic, Inc.*, the Fifth Circuit set down a test to distinguish actual evidence of discrimination from mere "stray remarks," which are an insufficient basis to support such a conclusion.  82 F.3d at 655-56.  This four-part test set examines whether the remarks were:  (1) related to the protected characteristic at issue; (2) proximate in time to the adverse employment action; (3) made by an individual with authority over the employment action at issue; and, (4) related to the employment action.[5]  *See id.* at 655; *see also Auguster*, 249 F.3d 405.

In the case of Kittiko's allegedly demeaning non-verbal behavior, the evidence fails the second prong of the *Brown* test – proximity in time.  By Morris's own account, the incident in

---

[5]     The Fifth Circuit acknowledges that the Supreme Court once overturned a case involving its "stray remarks" jurisprudence. *See Auguster*, 249 F.3d at 405 (discussing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)).  But the Fifth Circuit held that the key issue that the Supreme Court discussed in *Reeves* was not the stray remarks jurisprudence, but the question of whether a plaintiff had to introduce further additional evidence of discrimination after setting forth a prima facie case *and* showing that the proffered legitimate explanation was pretextual.  *Id.*  The Fifth Circuit had held that a plaintiff had to bring forward additional evidence.  *Id.*  The Supreme Court reversed, holding that a jury may be permitted to find for the plaintiff without any additional evidence.  *Id.*  The Fifth Circuit emphasized that *Reeves* did not "overrule our stray remarks jurisprudence" in any way relevant here.  *Id.*

question took place almost six months before she was laid off.  *See* Morris Dep. 38:12-40:6, 41:14-42:16.  Furthermore, it also fails the fourth prong of the *Brown* test – relatedness to the employment action – because Morris suggests no way in which a demeaning look was particularly related to her inclusion in a mass layoff.  Accordingly, this piece of evidence does not rise beyond the level of a "stray remark," and is thus not enough to create a triable issue of fact.

In the case of Denise Anderson's allegedly racist comments, the evidence fails the third prong of the *Brown* test – being made by a person with authority over the plaintiff.  The uncontested evidence on the record states that Denise Anderson had no supervisory role or authority over Morris.  *See* Def.'s Facts ¶ 10; *see also* Dep. of Kate Kittiko 29:8-22 ("Kittiko Dep.") (Doc. No. 19-3 Ex. B); *see also* Pl.'s Facts ¶ 10 (disputing a number of factual assertions in Def.'s Facts ¶ 10, but not disputing the assertion that Denise Anderson had no authority over Morris).  Accordingly, this piece of evidence also does not rise beyond the level of a "stray remark" and is thus not enough to create a triable issue of fact.

### 2.    Morris claims retaliation

Morris also claims that her 2008 layoff was in retaliation for opposing unlawful employment practices.  *See* Resp. 4-6.  Specifically, Morris avers that her layoff was in retaliation for her in-house complaints concerning the allegedly racist attitudes of certain ADC supervisors and her association with another ADC employee who was seeking redress for alleged sexual harassment.  *Id.*  ADC argues that Morris does not establish a prima facie case of retaliation and that, even if she had, the aforementioned cost-cutting program was the sole and legitimate reason for her layoff .  *See* Mot. 10-12.

-14-

The NMHRA prohibits retaliating against an employee who opposes an unlawful discriminatory employment practice.  *See* N.M. STAT. § 28-1-7(I).  An employee's "[o]pposition may take many forms . . . [but] if the [employee's] statement does not mention a specific act of discrimination, the employer must be able to discern from the context of the statement that the employee opposes an allegedly unlawful employment practice."  *Ocana v. Am. Furniture Co.*, 135 N.M. 539, 553 (2004) (internal citations omitted).  A retaliation claim may be demonstrated using the familiar *McDonnell Douglas* three-step approach, and to present a prima facie case of retaliation an employee must "show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between these two events."  *Id.*

### a.    Morris sets forth a prima facie case of retaliation

ADC argues that Morris failed to set forth a prima facie case of retaliation.  *See* Mot. 10-12.  Morris contends that she has set forth such a case.  *See* Resp. 4.  ADC contends specifically that none of Morris's claimed protected activities – such as her various complaints to Ruff in the human resources department – should qualify as protected activities, which would directly undermine the first element of a prima facie case of retaliation.  *See Ocana*, 135 N.M. at 553 (stating that the first element is that the alleged victim "engaged in a protected activity").  ADC argues that internal employee complaints alleging that a supervisor is generically racist are "insufficient to invoke the anti-retaliation provision of the discrimination laws . . . [instead,] a plaintiff must demonstrate a reasonable belief that the conduct she is reporting is unlawful."  Mot. 11 (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) and *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271-72 (2001)).

ADC reads too much into the cases it cites. In *Turner*, the Fifth Circuit held a complaint concerning a *single* allegedly racist comment could not qualify as a protected activity under federal law. *See* 476 F.3d at 348. Similarly, the Supreme Court held, in *Breeden*, that a complaint about a single sexually coarse comment could not qualify as a protected activity. 532 U.S. at 271-72. In *Breeden,* this was because a claim for retaliation requires at least a reasonable belief that the employment practices being complained about were unlawful, and a hostile work environment claim requires a "severe or pervasive" environment of sexual harassment – which a single off-color comment clearly did not produce. *Id.*

Here, however, Morris complained of a number of issues concerning multiple alleged indicia of racism on the part of two individuals – Kittiko and Denise Anderson – with some supervisory responsibility at ADC.[6] *See* Resp. 4. A hostile work environment claim, by definition, requires a steady drumbeat of harassing and interfering overt behavior to succeed. *See Breeden*, 532 U.S. at 271-72. By contrast, race or national origin discrimination requires no such manifestly continuous pattern of offensive behavior to be real – an employer can make a discriminatory employment decision covertly and without ever uttering a single off-putting

---

[6]      Morris, in her deposition, gives two examples of allegedly racist comments made by Denise Anderson. *See* Morris Dep. 68:23-69:10. ADC points out that Morris admits to not recounting these specific comments when making her complaint to Ruff, and thus ADC concludes that her complaints about Denise Anderson did not actually concern the subject of racism. *See* Mot. 12. This argument is premised on an overly selective view of the evidence, however, as Morris insists that she made the nature of her complaint concerning Denise Anderson clear in her discussion with Ruff, including the contention that Denise Anderson "was saying a lot of derogatory remarks against Mexicans in the office." *See* Morris Dep. 61:10-21.

-16-

remark, racial epithet or negative statement.  *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005) (finding that an employer had developed an elaborate secret plot to fire an employee for "unlawful [discriminatory] reasons," and then "cover up" said reasons by issuing falsely positive performance evaluations of the employee in question).  Morris made formal workplace complaints about perceived racism.  Racism in the workplace can silently lead to or manifest itself as unlawful employment practices, and New Mexico law takes a fairly liberal approach to defining "opposition" to an unlawful employment practice.  *See Ocana*, 135 N.M. at 553.  For these reasons, the Court is not swayed by ADC's argument that Morris's activities were unprotected.  Thus, Morris has set out a prima facie case of retaliation, and summary judgment is not be granted to ADC on the grounds that Morris has failed at this stage.

> **b.**     **ADC sets forth a legitimate, nondiscriminatory reason which Morris fails to rebut**

As discussed above, ADC sets forth the legitimate, nondiscriminatory reason of cost-cutting to justify Morris's layoff and shows that it laid off a substantial number of people in late 2008 because of difficult economic conditions.  Morris attempts to undermine this reason, but, as discussed above, the Court finds these arguments unconvincing.  ADC further argues, in this connection, that Morris's layoff could not have been motivated by retaliation because Kittiko, the supervisor who selected her for inclusion in the layoff, was not aware of the conversations that Morris had with Ruff concerning allegations of racism.  *See* Mot. 12.  Morris responds by arguing that the evidence only shows that Kittiko, when deposed, could not remember if she had been informed of said conversations, and that it would be inappropriate to infer from that evidence that Kittiko was indeed ignorant of these complaints.  *See* Resp. 6.  However, as Morris acknowledges

in this context, even if the Court disregards the contention that Kittiko had no knowledge of the complaints at issue, this would only help to establish Morris's prima facie case of retaliation. *Id.* at 4-6. It would not serve to bolster her case at the later stages of the *McDonnell Douglas* analysis. Because the Court has already concluded that Morris set forth a prima facie case, but holds that her case fails on the showing-of-pretext prong, this issue does not need to be decided specifically.

## III.    CONCLUSION

Because Morris is unable to demonstrate that there is an issue of fact as to whether ADC's legitimate, nondiscriminatory reason was mere pretext for unlawful discrimination, and because the evidence she brings cannot support a direct evidence case of discrimination, ADC's Motion for Summary Judgment (Doc. No. 18) is **GRANTED**.

**SO ORDERED.**

**SIGNED** on this 10th day of August 2010.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

-18-